Morning, welcome to the most New Orleans related argument that we have today. None of the three of us are in New Orleans much to our dismay, but maybe both of you are. I wish I were your honor. I'm in Lake Charles. And we're struggling a little bit over here, but it's okay. Well, there's another one coming. We'll see if it hits right between the other two. Well, this is the third case of the argument of the third argument today. A appeal called Echeverry v. Jazz Casino. We're here for Mr. McElroy. Thank you, your honor. May it please the court. I am Lori McElroy up in cold Milwaukee, Wisconsin, but I represent Jazz Casino Company doing business as Harrah's New Orleans Casino. Would you rather have the cold or the hurricane hit it towards you? I would prefer the cold, thank you. But we did have lower than 32 degrees yesterday, so a lot of frost killing our flowers. It's all in these seasons up here. Absolutely. In this case, plaintiffs stipulated that Alabama Wildlife was an independent contractor. That's key in this case. Also, plaintiffs stipulated that Jazz Casino hired Alabama Wildlife in January of 2017 before work commenced then in February of 2017. And the work, you probably saw in the briefing, the work was to remove starling birds, an absurd number of starling birds and 27 trees that were along a public sidewalk and part of the Jazz Casino premises. At the time of the accident, they were on the public sidewalk. This appeal is not about the weight of the evidence, but about the sufficiency of the potential liability for Jazz Casino. And we believe the evidence was insufficient for each of these theories. In summary, to give an overview where I was going, in case you have an idea of where to fit in some questions, in Louisiana law, there is generally no liability for the principal for the acts of the independent contractor. The burden of the proof is on the plaintiff to show that an exception might apply. There were two exceptions that plaintiff attempted and are applicable to today's argument. One exception involved is the plaintiff needs to show that the principal gave either express or implied authorization to an unsafe practice. Here, the plaintiff simply obtained evidence that there were better practices available, but there is no evidence, we believe, that what was being done violated industry standard. Another exception that was applicable here is the plaintiff needed to prove that Jazz Casino had the right to and actually exercised operational control over Alabama wildlife. It's a step-by-step control over the actions of Alabama wildlife. Operational control, you know, in this matter, Jazz Casino had no knowledge how to remove birds from trees, and none of the attempts by them in the previous years, by either them or other contractors they hired, had been successful. They could not control the manner and methods used by Alabama wildlife. The third theory that was presented to the jury was whether Jazz Casino actually hired an irresponsible independent contractor. Necessarily for a negligent hiring claim, the acts, the vetting had to have occurred prior to the hiring. And if you remember, we stipulated that plaintiff was Alabama was hired. You did know that the Better Business Bureau assigned an F to the performance of that particular company. You did know that then, correct? Actually, that's not correct. The testimony that came out was a man by the name of David Stewart was assigned the task of getting rid of the birds. Answer my question. When did you know that the Better Business Bureau had assigned that company an F? In the litigation of this case. That's the first time you ever knew it. That's what David Stewart, he does not, he says he usually looks up the Better Business Bureau. He couldn't remember if he had in this case. And in fact, when he did his vetting, nothing negative came of his vetting. So it, there is no information that he knew anything about the F rating prior to this litigation. Okay. I misunderstood that. No, that's, that's, I I've read the transcript and deeply and the negligent hiring also goes to safety. And when we're talking about the Better Business Bureau, that F rating relates to the fact that they did not, it's a pay to play situation, but they did not respond to two complaints. One was, I think a wire, an owner said a wiring had become loose, you know, precluding raccoons. So it wasn't anything about safety. I mean, if you're correct, that he did not know it until litigation, then it does not matter, does it? Well, that's true too. There is an area that I wasn't going to get into, but it goes to whether they had actual knowledge or should have known. And here we don't think it really matters because in the grand scheme, I mean, they should have known that the Better Business Bureau had given it an F. That's what I understand the argument to be. How could they possibly should have known that? Well, I agree with you. I don't know what the rating was. Well, and I agree with you. I don't know how they should have known if in fact, they had checked the Better Business Bureau. The testimony is he generally does, but he did testify he didn't find anything negative. So if there was an F rating, he did not see it and did not know. So he did. So the testimony was that he may well have checked with the Better Business Bureau, but he has no recollection that they had indicated that the company had an F rating. Correct. That's correct. But he had no recollection of what rating they had one way or the other. Correct. He doesn't remember what he found, if anything, at the Better Business Bureau, had he checked? He had checked at the time before hiring him, as he said he did. And they replied to him, they would have told him that it had an F rating. So they are deducting, is it proper to deduct from that set of facts that he did know at the time of hiring, that they had an F rating by his own admission? I don't think it is fair to deduct that because I don't think it's clear that he actually did check the Better Business Bureau based on his... I thought you said he said he always did. He said he usually did, yes. It was something that he generally did, but it was not a huge part of his job to have done this vetting. That was also evidence in the case. Usually it was done by other people, but he did this because he was put in charge of trying to figure out what to do with the bird problem. But before we leave that issue, I mean, it's not central, but let me make sure I understand. Would he have found whatever the rating was by just looking online if he had checked, not actually calling, talking to anybody at the Better Business Bureau? That's my understanding that it is posted online, yes. So check it online, maybe he just didn't see it, whatever. Well, you have other issues, I'm sure, why don't you move on? Well, let me just finish up with that issue. The Better Business Bureau witness actually testified that the Better Business Bureau does not make judgments or determinations regarding the quality of products, service, or anything of that sort. The F rating was solely as a result of not responding to a complaint. It had nothing to do with safety. But David Stewart didn't know that. David Stewart didn't see that and didn't follow up. So that is not something he knew, correct? Yeah, okay, okay. I think in the end, it doesn't make a difference. Counsel, what about this, the insurance certificate and the insurance coverage? Because there may be some dispute about what Mr. Stewart knew or didn't know about the Better Business Bureau, but the casino knew at the time AWR was hired that they did not have evidence of insurance, did they? Thank you, Judge Wilson. Let me move ahead here. The negligent hiring claim, we can discuss about the, we believe it was erroneously admitted for various reasons, but the evidence for a negligent hiring claim basically was the policies and procedures and the certificate of insurance, which was all after the hiring occurred. So it could not have affected or it cannot support a negligent hiring claim. But I thought the record was that before the casino hired any vendor, they would have had this certificate of insurance or the evidence of insurance coverage. Am I wrong about that? That is what typically happens. That is what typically happens because what happens is you get a vendor and you put their information into the software and one of the clicks you have to do is make sure you have a certificate of insurance. In this situation, and I understand this was a purchase order, so it was a little different, but in this situation, and I understand it happens at least once a month where a vendor comes in and doesn't have a certificate of insurance and they can override that and let things go. And in this situation, they showed up, gave them a certificate of insurance from the policy period, from the prior policy period that had been on file with the state of Alabama for their licensure. But when we saw, when the computer, when people were checking it, they said, hold it, that's last year. So they talked to Alabama Wildlife as they're starting up and saying, we need a current, but go ahead and work because the Alabama Wildlife said, we'll get you the current. We do have insurance. So, you know, let's proceed. Did they get, did they provide the certificate of insurance? No, the evidence shows that they never did get an updated certificate of insurance. They did make a couple follow-up requests for that, but the certificate of insurance never was provided. Now in our, in my situation here, I, the evidence is clear that it all happened after the hiring happened. So it really is irrelevant because it was after the fact. How is it irrelevant if they proceeded to hire the company without the evidence of insurance coverage? I mean, doesn't that go to a safety question or does it? Oh, it doesn't go to a safety question. Insurance has never gone to safety. In fact, the federal rules of evidence 411 says that you cannot introduce lack of insurance to prove negligence. And that's exactly what happened in this case. There are exceptions that are inapplicable to this case, but you, I'm sorry, counsel, but that, that may be lack of negligence or lack of insurance and negligence of maybe AWR, but wouldn't, wouldn't the casino's failure to ensure that there was insurance go toward the negligence of the casino and wouldn't that be okay? No, no. In fact, I'm looking for the case, the, this all happened after the hiring. And once you have the hiring, the Guillory case is actually. What I understand, I mean, are you sure about that? In other words, I thought before the, at the time that they were hiring them, upon hiring, they said, oh, you, you've got to produce a certificate of insurance. And they produced a certificate of insurance that was outdated. And they knew that there was a, that the company did not have insurance, I suppose, could not afford insurance. And apparently it didn't raise any red flags that maybe this is an irresponsible company if they don't have insurance and can't get it. And I appreciate that, but they hired them before they showed up and they told them to bring the certificate of insurance from the way the already hired them. And before they start to work, they want a certificate of insurance. And they say, we can't provide it for you. Well, they said, we will provide it for you. No, they gave them an old one and said they will provide it and never did do it. I mean, that sounds like negligence to me. Well, I mean, negligence in hiring. Well, if you look at the Guillory case, the principal had knowledge that even in that case, the independent contractor was in violation of safety regulations, but the case was very specific that it all occurred after the hiring. So that precluded evidence toward a negligent hiring case. You're saying they started after the hiring, but before they started to work. Correct. They were hired in January of 2017. So everything regarding the insurance happened after. Before they started to work. When they started to work, they showed up on February 6th and started to work. They didn't have insurance and you knew they didn't have insurance when they started to work. We don't know they have insurance. There is no evidence in this case that in fact, there was no insurance. That has never been the facts of this case. The facts are the case. In addition to that, they were unreliable because they told you they would provide a certificate of insurance, never did it. And then you were negligent and never requiring them to show that. I mean, it just seems to me that... And I understand. ...argument is getting a little slippery. Well, no, the negligent hiring claim has to go to competence and safety. And there is nothing about competence or safety related to an insurance policy. And again, the stipulated hiring is in January of 2017. And everything regarding the certificate of insurance was in February of 2017 after negligent hiring. And under the Guillory case, that cannot support a claim for negligent hiring. Going into the other... You have 10 seconds left. You may want a closing statement here. Thank you. The use of a man lift with one flagman is exactly what the standard of care required. That's the undisputed evidence in this case. That was being done. It was done poorly by Alabama Wildlife, but that doesn't put a duty on Jazz Casino because there was an acute failure. It doesn't go to control or authorization. Thank you. I'll wait for my rebuttal. All right, counsel. Good morning. May it please the court and counsel. I appreciate your time. I want to start, if the court will indulge me, by talking about another argument I had before this court. I've had the opportunity to argue before the Fifth Circuit. This is now my fourth time. But I want to go back over 20 years when I was a young lawyer and I learned a valuable lesson about appeals with the court. I did defense work at the beginning of my career, and I switched over to a plaintiff's firm. That plaintiff's firm I went to work for had a lot of really good cases. But unfortunately, when I started with the firm, I didn't get those cases. I got the cases in the lawyer's filing cabinet they wanted to get rid of and give to the new guy. One of those cases happened to be a case pending in the Western District of Louisiana, Lars Smith v. Walmart. It was a slip-and-fall case, and I was trying to prove that Walmart was negligent. As a young lawyer, I had a lot of fire in me. I hope I still do, but a lot of fire in me. So I went and worked up the case, and we go to court, and we tried the case to a jury. I thought it was a brilliant jury after they answered the first two questions. Was Walmart negligent, and did that negligence cause the plaintiff's injuries? Yes and yes. I said, this is a great jury. But then my jury went off the rails a little bit. The next questions were, was the plaintiff negligent? Yes. Then how much fault do you assign the plaintiff? It was a lot more than they assigned to Walmart. On top of that, the award in the case for a back surgery was $75,000. I said, wait, I did such a great job on this examination of the physician. I understand. I know there were some pre-existing conditions there, but they should have given me more money. So you know what I'm going to do? I'm going to appeal to the Fifth Circuit, and I'm going to get this travesty of justice overturned. And so I learned a valuable lesson. You're pretty deep into your time. I bet you have a good point. Why don't you make that point, and let's get to the case. Yes, sir. Well, I understand. I was trying to... I know you've read the briefs. I was trying to interfere too much with how you set this up. What I was saying is, is I learned in that situation that juries have a lot of deference, and for a good reason. And in that case, when you consider all the evidence, the Court of Appeal did exactly what it's supposed to do, and that was a firm verdict. And so, you know, the longer... It seems to me... That was then, and now isn't it, right? Grady, I'll stand down. Go ahead, Judge Daly. I'm sorry. Go ahead. Yes. No, no, Your Honor. I'm sorry. Go ahead, whoever wants to talk. I think the key questions for me that I think you need to address... First, do you agree, if we find there's insufficient evidence on any of your theories of negligence, there has to be a new trial? And secondly, it does seem to me the points that your colleague, also on the screen here, was making about negligent hiring and the other claims, they have some traction. So help me with both of those. If any of yours fail for insufficient evidence, do you need a new trial? And then secondly, deal with the negligent hiring and the other issues? Yes, sir, Your Honor. Your Honor, first of all, I think the issue is, and I'm still not clear on this after reading the case laws, was this a general verdict or a special verdict? I think that makes a big difference. To answer your question, if, as we contend, it was a special verdict, not a general verdict, then the court has vast discretion. Now, the court has vast discretion to affirm. A general verdict, in my view, is if you watch movies like The Rainmaker or read the books, do you fine for the plaintiff? Yes or no? And how much money do you award? Let's assume this is a general verdict. What is your response to Judge Southwick? Judge Southwick, you're absolutely correct that if all the theories of liability are supported by evidence, then there's no issue with the general verdict. But if it's clear from the judge's instructions accompanied by the verdict form, what the jury is supposed to do, then that's sufficient. You don't just look at the general verdict form. You have to consider that in connection with the jury instructions given by the judge. And in this case, I believe the jury instructions given by Judge Fallon, when considering in conjunction with the questions asked of the jury, was more than sufficient to support what the jury did. And also, there is a sort of a harmless error-type gloss rule that even if one of the theories isn't supported, if the evidence is clear that or the record's clear that the basis of the jury's verdict is based on a theory that was supported by the evidence, then there does not need to be a new trial and the court can affirm. That's my understanding. I'm not sure that the harmless gloss rule can apply here because, I mean, if I read the record right, each of those theories was pressed before the jury, like in closing and during the trial itself. In other words, we can't clearly see that you really didn't press negligent hiring. It was all about authorization of unsafe practice. You pressed all those theories, correct? Yes, Your Honor, we did. So back to Judge Southwick's question, if any of those theories fail, if the evidence is insufficient, then we have to send this back for a new trial, correct? I think, Your Honor, that I certainly would not want that to happen, but that may well be correct if you conclude that the jury instructions in connection with the verdict form were insufficient. Well, let's do this then. If you could tell me, counsel, with regard to each of those theories, tell us the evidence that was sufficient. For example, with negligent hiring, tell us the evidence that you've introduced before the jury of the casino's decision to prior to the decision being made. In other words, give us the evidence you've got that is sufficient for the jury to decide. Well, Your Honor, first of all, it was Harris' policy, Harris' own policy, that before a contractor could be hired and before a purchase order could be issued, that a certificate of insurance had to be provided. And I know that there's an argument that a certificate of insurance doesn't go to safety, but I disagree completely. And I can tell you right now, having been here in Lake Charles, Louisiana, after this storm, there were a lot of fly-by nights coming by, trying to get people to hire them to do work. And I can tell you, I would no more let one of those contractors without a certificate of insurance or a bond get on my roof than the man on the moon. And that's in Lake Charles, Louisiana, at my house. How much more of a duty does Harris have at one of the busiest intersections in New Orleans to make sure that his contractors are insured? Evidence of insufficient insurance or no insurance determines reliability. The jury could well conclude that this contractor was unable to attain insurance, that this contractor was not reliable, this contractor was unsafe for not having insurance. That's number one. Second— Let me ask you, what are we actually looking at here? I mean, Ms. McElroy talked about the hiring decision, and then a lot of this happens after the hiring decision. So, insofar as Louisiana law is concerned, what's the time period we're looking at? To the extent Ms. McElroy confuses—confuses us—I probably would confuse it—convinces us that the hiring was done by a certain date, and what you're talking about comes in later, the hiring's already been made. What's Louisiana law on that? How relevant— when's the hiring done for—insofar as negligent hiring is concerned, that claim? And how do some of these things that you're talking about actually fit in either post or before the hiring decision? Well, Your Honor, it's what—and I know it's a little bit up in the air, but it looks like the courts have all ultimately come down the side of, when they're doing their if you should—before hiring, it matters, because if you should have known— Well, so you're saying the hiring decision is in January, if I recall what Ms. McElroy said? Uh-huh. So, you're agreeing that that's the decision, and so we're looking at what they should have known as of January, or just—I mean, it seems to me one argument would be, but it may not be supported by Louisiana law, is by the time they show up, they still are on a sort of probationary hiring, and when they don't close the things that like provide the certificate of insurance, the decision could be made there where, okay, we're not going to hire you after all. I mean, I don't know how that would play out, but I don't hear that argument from here. But, Your Honor— Are you agreeing the hiring decision is a specific time, and we look at what they should have known? What we know, Your Honor, is that its own policy was, was before the hiring was to take place, before it was to take place, they had to have a certificate of insurance. That's not an argument I'm making. That's Arizona's own policy. Your Honor, they certainly knew, or should have known, before hiring about the Business Bureau F rating, because that's something that Mr. Stewart testified that he would have done ordinarily, and he said, I probably did it here. So, that was before the hiring, Your Honor. Now, that's on the negligent hiring claim. Certainly, independent negligence and other issues, you know, what they continued to do, after they got to the property, I understand that may be set up from the negligent hiring claim. But I believe, Your Honor, that when the policy says you cannot let a contractor step foot on property, and you cannot issue a purchase order without first verifying insurance, that's, they should have known when they didn't have that before they issued the, the, the, the purchase order to hire this contractor. With respect to one of the theories that you asserted, and that's the authorization of the work practices that caused the injury, what evidence do you have of that particular thing that supports that theory? The authorization of unsafe work practices, well, Your Honor, I think the best evidence, and there's a lot of it, but I think the best evidence, Your Honor, is, is that David Stewart was out on the project. He's a Harrah's employee and supervisor, out there supervising, was actually out on the project when it happened, not just out there observing, but actually helping with the work and setting it up. And he was in a position to stop it, Your Honor. Louisiana cases distinguish between operational control of the independent contractor, as versus to, as versus the authorization of the work practices. Yes, sir. Those are two distinct things. Now. Yes, sir. You're talking about operational control being out there on, on the premises at all times, but what about his authorization of the work practices? Okay, Your Honor, if I recall correctly, I'm sorry, Your Honor, I didn't mean to interrupt you. That's all right. My recollection of the law, Your Honor, is, is that it's expressly or impliedly authorizes an unsafe work practice. In this situation, you have a contractor with a, with the, with the Harrah's principal on site, allowing the contractor to move a man lift at rush hour with no barricades, no cones, no warnings whatsoever, that that man lift is about to be moved with one flagman. Now, Ms. McLemore has, has stated. The Louisiana cases, at least in the briefs, indicate that the fact that he may have been there is not sufficient to satisfy the requirement of authorizing the unfair or the, the negligent practices that were occurring on the premises. Your Honor, if I may add a little bit to that, Richard Tyler, who was an AWR employee, testified specifically that David Stewart was providing orders to the employees with respect to how they were performing safety on the project. And, and one of, and he was the one who was telling them what they needed to do, and he was out there directing traffic, and he was saying, here's our warning signs, and he'd be in that sort of thing. He knew when this was going on that none of those safety precautions were in place. He knew it. So, I would argue, Your Honor, that whether he ordered them to continue because they were in a hurry to figure to, to finish the project or it was implied, he was allowing them as the principal in charge of the project for Harris to perform unsafe work. Doesn't Louisiana law specifically say that the mere fact that he may have known of it and did nothing about it is not the same as authorizing it and that's not satisfying that particular theory that you assert in the trial. Your Honor, I would agree with you if that was, were all he did. If all he did was, was go out to the project that one time and let him do it, I would agree with that. But, but, but the entire history of the project is he did much more than that from the beginning of the project on and was in charge of safety. And so, he's the one who's authorizing the safety practices on the job, Your Honor, and I, and I think, I think it's expressed. I think according to Richard Tyler, he expressly was the one in charge of safety and, you know, again, I agree with you 100%, Your Honor, if this were a one-time thing and he just happened to be out there and he happened to see them doing something unsafe and he didn't stop him, I would agree with you 100% but there's, there are so many more facts than that and I think that's the, the issue with this whole argument that Harris has made. If you look at the, if you look at what Harris is arguing, Judge Fallon and the jury blew it and this should have never gotten to this point. I'm wondering why, if things were so clear with the facts, no Rule 56 motion for summary judgment was ever filed and why they didn't argue if there were no genuine issues of material fact, if there's no evidence at all to support these claims. And the other thing that Harris is doing, with all due respect, is Harris is asking this court to examine every fact in a vacuum and in fact, if you look at how their brief is, is organized, the facts are examined one at a time as if they're in a vacuum. Well, lack of insurance isn't enough. Better Business Bureau isn't enough. David Stewart being on the site is not enough. Them deciding not to use barricades and whatever instead of a flagman is not enough and it goes on and on and on and so the, the laws I understand it is and this is why I'm getting back to the jury verdict and why jury verdicts are so sacrosanct is because the, the law is, is that you don't examine the facts in a vacuum. You consider all the evidence that the jury had before it and you're trying to figure out if there's an absence of evidence to support the claims and your honor. Let me ask you, since time is running down, address the amount of the verdict. That seems to be a rather high verdict for the injury that was, uh, at issue in this case. If I may, your honor, I, I've thought about that a good bit and, and, um, I think the jury was very deliberate in what they awarded in damages and you have to consider what they awarded for futures in connection with the past. I feel like the past was, was low. I feel like the, uh, the, uh, loss of enjoyment life was low. I think they considered each damage element separately and let me tell you why I think they awarded a million dollars for future damages. Harris could, could have had an expert witness had it chosen to try to refute the future that Mrs. Echeverria is facing with respect to her medicals. Mrs. Echeverria was in her early thirties when this happened. Mrs. Echeverria, I'm sorry, she's not married. Mrs. Echeverria was in her thirties when this happened, your honor, and she has over 50 years of undisputed daily pain, including a baseline toothache in her ankle. She has an injury that apparently, uh, Tylenol and Aleve will, um, is, is, is the only medical medicine that she's taken for it. And I don't see any kind of impairment of enjoyment of life or impairment of her ability to succeed in her profession. Uh, and if she were given a million dollars at this point and they put it into some fund that started operating, uh, and making money on that money, I mean, she soon winds up with a whole lot of money for an injury that is relieved by Aleve and Tylenol. And that seems to be just a bit questionable. Your honor, with all due respect, I don't believe it is relieved with Tylenol. I think what the problem is she has no surgical options at this point, you know, and we have this opioid crisis. So we certainly don't want her taking pain pills every day and she's got to go to work. And I think she should be credited, not, uh, not, uh, discouraged from working. I think she should be credited and praised for that, that she goes to work every day, despite her pain, despite her suffering. Dr. Zuri, your honor, testified without dispute that she has a life expectancy from the date of trial of 52.2 years, and that every single day she's had a baseline, uh, toothache in her ankle. She already has degenerative arthritis in her early thirties. It's only going to get worse over time. She's going to need future surgeries. Uh, and the doctor talked about that link. This is going to be a progressive problem for her, your honor. And you know, your honor, the other thing I would say is, um, Ms. Echeverri was not a particular active person. And I think the jury took that into account when they decided to award $30,000 for loss and enjoyment of life. But what I do say is the opportunity for her to change her lifestyle, to jog, to do things that she would may have decided to do as a young woman in her life had been taken away from her. And, um, so that's my response to that, your honor. I hope I've adequately addressed your question. I'm happy to talk more about it if you'd like. Let me ask, what is your best evidence that David Stewart on the actual event that occurred controlled the movement of the man lift and whatever other precautions were made as part of that movement? You have some evidence from another worker that he did an awful lot of directing out there. Yes, sir. What is your best evidence? Is it that he sometimes did, or did somebody testify that on that movement that ran over her ankle and leg that he was involved in how that work was done? Well, he was, he was directly involved. In fact, in fact, your honor, the testimony was undisputed that he was out on the job site, not just suit, not just watching, but actually setting up barricades. Right. And other works on barricades. I know that's in the evidence, but I'm talking about the movement of the man lift and who was keeping people away from the direction of it, whatever. He was there, he was helping by setting up barricades in the new location or moving them the old whatever this story is. But what do you have on him directing what the person up on the man lift was doing or otherwise that led to this injury? Your honor, I don't have any direct evidence that he ordered anybody to, to, um, um, I don't, I don't have any direct evidence that he ordered anyone to move the man lift at a particular time, but what I do have direct evidence of he knew exactly how it was going to be moved. And in fact, he was the one who directed how it was going to be moved and it was unsafe. And Richard Tyler testified at length about that, about the safety requirements that Mr. Stewart said were supposed to be taken on the project, which were not at all enforced when this happened. Your honor. All right, counsel. Thank you. Thank you, your honor. Appreciate it. Ms. McLaurin. Thank you. I'd like to just pick up on that. I think I would challenge the court to look at the evidence of Richard Tyler when he did say at one point that, uh, David Stewart was there, but he clarified in his testimony and it was clear throughout his testimony that in fact, the employees of Alabama wildlife took their supervision from Phil Padgett, who was the owner of Alabama wildlife. This is kind of like in the Vocha's case where, you know, Mr. Stewart said less than 10% of his time was checking on the Alabama wildlife of advancing their, their work. And in fact, uh, at the time of the accident, Mr. Stewart was up the block with Phil Padgett and Mr. Tyler told him that the barricades were placed where Alabama wildlife wanted them placed. So in fact, David Stewart was just assisting. And in fact, after the accident, uh, David or Richard Tyler, the driver said he couldn't tell those guys were all the way up the block, a block away. And in fact, he had to continually wave his arms to get their attention. So there's no information that David Stewart had any, uh, any knowledge of what was going on, but I want to go back. Let me ask you about the law on this. Let's say there is some gave orders on how things were done, and you can tell me that's not so. But I'm hearing that from Mr Hanson. But there's no evidence that that day and actually some evidence that he wasn't doing it that day. Uh, what's the important evidence here from which juries can draw the inferences they want to draw? I mean, if if you're a company man actually told them to move the man if they did in this way, without having more precautions that day, uh, you accept you would be liable and your client. And so the absence of such evidence, those protection. No, I think the law is really clear that the independent contractor, which is stipulated here, the principle is not liable for their actions. And in fact, there's case law that says you do not have to law. We've already talked about that. But I'm actually giving directions. Unlock the case law that says he's given guidance and he's got the right to make recommendations, whatever. But the evidence is he's actually given directions, and I thought there was evidence that sometimes he did that. I'm just asking, must there be evidence that he was doing it that day when this injury occurred? Um, I don't know if the law is clear on that. And I would say in the principle, independent contractors situation that no, no, there would not be. And in fact, the only undisputed evidence in this case is moving. The man lift with one flagman is completely standard of care. So assuming in your situation where that is happening, that wasn't an unsafe practice. When, uh, when it was asked about what is all the evidence supporting the authorization exception to no liability, the evidence that you've heard was simply that there were better practices. No law has ever said that better practices are what you base your claim on. It has to be industry standard and a breach of that standard of care that did not happen here. My time is running here. I did want to just say that I agree that in this case, it was a general verdict and we have no idea how the jury made their decision. We don't think that there's evidence of any that is sufficient for any of the claims. I would, I would go back to the negligent hiring. We talked about the policies and procedures, the long Louisiana is that policies, internal policies do not give rise to an enforceable cause of action. I want to look at the insurance. If you, there is no law in Louisiana that one must have insurance. Um, in fact, that is a public policy that should be best left to the Louisiana legislature. Uh, in this situation, we have Richard Tyler who said he took his supervision from his boss, Phil Padgett. Richard Tyler is driving the, uh, man lift with one flagman. Richard Tyler brought flags with him. He was a certified man lift operator. David Stewart was not. The fact that David Stewart, the law is clear that we have a lot of situations where you say we're in a principle says you have to follow our policies and, or you have to follow our safety measures. Saying that did not make the principle responsible under any, uh, theory exception to no liability for an independent contractor. All right, then. An unfortunate accident. We'll try to do our part in figuring out what to, uh, how the law should address this. We appreciate both of your time. Good luck to both in hurricane infested and overly cold locations that you reside in. Uh, that is our last argument for the day. We are in recess. Thank you, Your Honor. Thank you, Miss McElroy.